UPON APPELLEE’S PETITION FOR REHEARING
WALDEN, Judge.
We speak to two points raised in ap-pellee’s petition for rehearing, the others being not such as to merit discussion.
In our somewhat lengthy opinion we said, with reference to appellee’s ear damage:
“His permanent injury was a partial loss of hearing in one ear, which is fully correctable with the use of a hearing aid .” (Emphasis supplied.)
Appellee now points out that our reference to only “one ear” was erroneous as there was damage to both ears. Being now so advised, we hasten to amend our original opinion to reflect correctly that both ears were involved as follows:
“His permanent injury was a partial loss of hearing in both ears, the damage in the left ear being correctable by the use of a hearing aid . . . .” (Emphasis supplied.)
Without acerbity, and with full appreciation of the difficulties that face counsel' when briefing and making appellate presentations in a complicated appeal such as this, we would simply note in passing from a new line by line examination of the briefs of the litigants and from the closing argument of appellee’s counsel the following:
A. None of the briefs contain any reference whatever to the fact that both ears were damaged. Where mentioned, and particularly in appellee’s brief, reference is made to a hearing loss in an ear, same being stated in the singular.[1]
B. In the closing argument of appellee’s counsel there is discussion of hearing loss, the use of a hearing aid, but there is not the first mention or reference to the fact that both ears were damaged.[2]
*643 C. Furthermore, it is our recall that during the course of oral argument a question from the Bench as to the specifications of appellee’s damage did not bring forth a definitive or illuminating response as to the number of ears involved and the damage to them.
And now appellee brings these eighteen lines to our attention:
“A. My examination of the ears, nose and throat essentially showed only that he had a nerve hearing loss in both ears, worse in the higher frequencies, enough to certainly justify his complaint of decreased hearing.”

“A. Yes, this is permanent nonreversi-ble hearing loss, in my past experience.”

“A. According to this latest test down in Miami, it seems to show that the right ear was somewhat worse than the left ear.”
‡ % ‡ sfc
“A. Normally we get the hearing aid for the better hearing ear. If there is a significant difference, sometimes factors of comfort, if there is not too much difference in it, it makes no difference.”

“Q. (By Mr. FitzGerald) In light of that is, Mr. Lassitter wearing this in his proper ear ?
“A. Is he wearing it in the left ear now?
“Q. Yes, he is.
“A. Yes, I would say yes.”
The above lines were scattered in amongst over two thousand pages of trial testimony; and from them it may be gleaned that indeed there was an involvement of both ears. Appelee now takes the court to task for misstating the fact, saying that the evidence on this point is clear and uncon-tradicted. Res ipsa loquitur.
Regardless, and in full allegiance to our judicial duty and appellate function, we have reconsidered our treatment of this appeal in light of the fact that the appellee suffered a partial loss of hearing in both ears instead of one ear. It is our judgment that our decision is responsive to the evidence and we are of the same opinion— still convinced — that the compensatory damages were excessive and without legal or factual support whether there was an involvement of one or both ears. Our conclusion was in nowise patterned upon this distinction, but rather upon the overall hearing loss and impairment.
For a second proposition the appellee takes exception to certain passages of our opinion concerning punitive damages as follows:
“. . . it is necessary in support of the verdict awarding punitive damages for there to be adequate proofs of the defendants’ net worth.”
“. . . the burden of proving the net worth of the defendant in such cases is on the plaintiff who has plead the claim.”
*644 “. . . There was simply no basis therefore for the jury to perform its duty and make an informed decision as to whether the awards were too much, too little, or just right in line with Florida Standard Jury Instruction No. 6.12. Forasmuch as we or the jury could know the awards may have served to utterly bankrupt the defendants; . . .”
We respond, hopefully in clarification, to the suggestion that our opinion as set forth does violence to Florida Standard Jury Instruction 6.12:
“PUNITIVE DAMAGES
“If you find for claimant and find also that the defendants . . . acted with malice, moral turpitude, wantonness, wilfulness or reckless indifference to the rights of others, you may, in your discretion, assess punitive damages against such defendants as punishment and as a deterrent to others. If you find that punitive damages should be assessed against any defendant, you may consider the financial resources of such defendant in fixing the amount of such damages . . . .” (Emphasis added.)
At the outset, we wish to be understood as paying allegiance to the Instruction as written and in particular to the use of the term “financial resources.” We agree that this is a correct exposition of the law and our opinion undertakes only to afford definition and criteria within its guideline.
Black’s Law Dictionary, Revised Fourth Edition, affords these definitions:
“RESOURCES. Money or any property that can be converted into supplies; means of raising money or supplies; capabilities of raising wealth or to supply necessary wants; available means or capability of any kind.”
“NET WORTH. Remainder after deduction of liabilities from assets.”
It is our view that the term “financial resources” as contained in the subject jury instruction is equivalent to the term “resources” just above defined. Thus, it is reflected that financial resources is a general term which includes, but is not limited to, net worth. It encompasses many capabilities and potentials other than naked assets and liabilities. We know as a matter of everyday experience that net worth is an accounting term capable of specific definition. It affords a theoretical reflection of any defendant’s ability to respond to a judgment. It was our purpose, albeit not a wholly novel one, see Tallahassee Democrat Inc., v. Pogue, 280 So.2d 512 (1st D.C.A. Fla. 1973), contra. Aaron v. Rinaldi, 296 So.2d 632 (3d D.C.A.Fla.1974), to hold that the establishment of a net worth figure is a minimum requirement under the term “financial resources” to support an award of punitive damages. It gives the jury a prima facie basis upon which to measure the punishment factor of a prospective amount of punitive damages per Instruction 6.12, supra. Moreover, it furnishes the trial court with a defined basis whereby it may assess the sufficiencies of the proofs as concerns punitive damages. This becomes imperative when assaying the merits of motions for directed verdict and a new trial. More importantly, at least from our point of view, it furnishes a basis whereby the appellate function may be exercised. We say again, then, that an applicant for punitive damages must, as a minimum prima facie predicate, establish the defendant’s net worth.
And now back to the term “financial resources” contained in the instruction. As stated, it is the broader concept and, depending upon the circumstances, there may well be additional proofs which would be helpful to the jury and court, which proofs would not be necessarily included in a defendant’s balance sheet. Thus, the term gives the trial judge a more liberal standard to determine whether a given proffer of evidence is relevant and material. For in *645 stance, there could well be, and properly so, proof as to income, cash flow, expenses, anticipated income, anticipated diminutions of income, anticipated casualties and, as in the instant case, proofs as to assessments of the membership possibilities. These items, among other of like moment, would be receivable in addition to net worth figures under the scope of financial resources. All of this material, including the reflection of net worth, goes to make up a defendant’s financial resources which the jury is entitled to consider in assessing punitive damages exactly as commanded in Florida Standard Jury Instruction 6.12.
We confess that our effort here is intended to set a standard which can be equally employed to a private individual or corporation as well as a labor union. However, we recognize that in the case of a labor union the matter is somewhat anomalous and awkward because of its unique organization and its capability of collecting dues and assessments from its membership; however, we do not believe that this distinction is enough to create an exception.
Thus, a claimant is obliged under our system of jurisprudence to plead his case with notice and to prove his case and each essential thereof by a sufficient quantum of the evidence. Repetitively, in the case of punitive damages a claimant, as minimum, must prove the defendant’s net worth. And in addition thereto, all such other evidence as he may wish as will reflect the defendant’s financial resources may be received in evidence and considered by the jury. If this is not done, and if this is not to be the rule, there can be no professional basis whereby an award of punitive damages can be made the subject of appellate review.
Having now undertaken to correct and clarify our original opinion, the appellee’s petition for rehearing is hereby denied.
Denied.
OWEN, C. J., and DOWNEY, J., concur.

. The pertinent references to ears as contained in appellee’s brief are found as follows:
At pg. 26: “During the course of Dr. Burgess’ treatment of the plaintiff, the plaintiff complained of a developing hearing loss in the left ear. Dr. Burgess recommended that he obtain consultation from an ear specialist which he did.”
# ‡ sj!
At pg. 27: “When Dr. Dasher examined the plaintiff after the beating, he received a history of progressive hearing loss, and in September the doctor performed a surgical exploration of the plaintiff’s inner ear, as a result of which the doctor concluded, and testified, that the plaintiff’s hearing loss was caused by nerve damage. The doctor further testified that in his opinion this nerve damage hearing loss was the result of and caused by the traumas to the head received by the plaintiff on April 10 from the beating. The doctor further testified that in his opinion the hearing loss was permanent and non-reversible and would require the plaintiff to wear a hearing aid in his ear the rest of his life.”
# # % # i{s
At pg. 61: “[T]he uncontradicted evidence shows . . . trauma-caused permanent and irreversible nerve damage to plaintiff’s ear, resulting in functional deafness without the constant and ‘forever’ use of a hearing aid.”

. The pertinent references to ears as contained in appellee’s closing argument are found in the record as follows :
At pg. 1946: “And we know that he had a hearing loss from this beating.”
*****
At pg. 1953: “[T]he cost of the one hearing aid he has now is 330 some dollars. .
“. . . Dr. Burgess told you that somewhere along the course of his treatment Earl Lassitter began to complain of pain and dif- *643 fieulty in hearing and that he, Dr. Burgess, referred him or recommended that he go to an ear specialist.”
#
At pg. 1955: “Now Dr. Dasher testified as to his findings, conclusions and treatment. And he said Earl Lassitter has nerve damage to the inner ear . . . [I]n his opinion based upon reasonable medical certainty the beating and blows that Earl Lassitter suffered was the cause of the hearing loss he has now, which is permanent and irreversible, and for which he now needs and does indeed wear a hearing aid.”
*****
At pg. 1958: “ . . .28 more years of going with the diminished hearing .

“. . . [T]his hearing loss is permanent, irreversible, and caused by the beating.”